

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| TEXAS DEPARTMENT OF AGING AND DISABILITY SERVICES, | § | No. 08-19-00095-CV |
| | § | |
| Appellant, | | Appeal from the |
| | § | |
| v. | | 327th District Court |
| | § | |
| MICHAEL LAGUNAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC# 2014-DCV-2261) |
| | § | |

**O P I N I O N**

This is an age discrimination/failure to promote claim brought under the Texas Commission on Human Rights Act (TCHRA). The dispute is before us for the second time. In a first appeal, Appellant, Texas Department of Aging and Disability Services ("DADS"), argued that the trial court should have granted its Plea to the Jurisdiction because Appellee, Michael Lagunas ("Lagunas"), failed to show that DADS hired a younger individual to fill the position for which he applied. While sustaining some relief for DADS in the first appeal, we rejected that argument and remanded the case. *Texas Dep't of Aging & Disability Services v. Lagunas*, 546

S.W.3d 239, 251 (Tex.App.--El Paso 2017, no pet.) ("*Lagunas I*").[1]  Following additional discovery, DADS filed a subsequent plea to the jurisdiction raising additional arguments, including that Lagunas failed to raise evidence that DADS' reason for not promoting was pretextual.  Based on the record before us, we reverse the trial court's judgment and render judgment dismissing Appellee's claims for lack of jurisdiction.

## I. FACTUAL BACKGROUND[2]

After we remanded the case in *Lagunas I*, the parties engaged in extensive discovery which has clarified, if not contradicted some of the factual background stated in our original opinion. We set forth only the matters necessary to decide this appeal.

DADS, which is under the Texas Health and Human Services (HHS), runs the El Paso State Supported Living Center (the "Center").  The Center provides residential treatment and training services for people with intellectual and developmental disabilities.  *Id.* at 243.  Lagunas was hired by DADS in September 2010, to work as a security/safety officer at the Center.  *Id*. at 244. In February of 2013, DADS posted a management position, identified as an "Assistant Director of Programs," also referred to as an "Assistant Unit Director" or "AUD," for which Lagunas applied.  He was 60 years old at the time.  *Id.* at 243-44.

---

[1] At the time the case first came to us, Lagunas had also asserted that DADS had discriminated against him through a number of distinct employment actions, and that it had retaliated against him for pursuing those claims.  *Lagunas I*, 546 S.W.3d at 245-46.  In *Lagunas I*, we held that the trial court should have dismissed those other claims because Lagunas failed to raise them in a timely manner with either the EEOC or the Texas Workforce Commission, and he therefore failed to administratively exhaust the claims.  *Id.* at 247-49.

[2] As we did in *Lagunas I*, we take our summary of the facts from the affidavits and deposition testimony contained in the current record, noting where the witnesses' testimony is in conflict, and resolving those conflicts, as we must, in the light most favorable to Lagunas.

When Lagunas applied for this position, DADS' management structure consisted of a four-tiered hierarchy. *Id.* at 243. At the top was the "Director of State Center," which at the time was filled by Laura Cazabon-Braly ("Braly"). Under Braly was an "Assistant Director of Programs," which at the time was filled in an acting capacity by Ruben Ochoa, who also served as the Center's Risk Manager and Security Director. *Id.* at 243-44. Under Ochoa was a "Unit Director," which was filled at the time by Adriane Hanway, and below Hanway were two "AUD" positions, one of which was the vacant position for which Lagunas applied. *Id.* at 243.

## A. The First Interview

Ochoa and Hanway were named as the "hiring authority" for the vacant AUD position, and interviewed five candidates, including Lagunas. They rated Lagunas the highest qualified candidate, followed by Jesse Medina, another security/safety officer at the Center, who at the time was under 40 years of age. Ochoa and Hanway selected Lagunas as their top choice for the position.

In an affidavit, which we had before us in *Lagunas I,* Ochoa expressed his belief that (1) he and Hanway as the "hiring authority" were the sole decision-makers in the hiring process, (2) Ochoa claimed that they "hired" Lagunas immediately following the interview, and (3) informed him that he was to start his new position the next day. However, in his deposition, taken after we issued our first opinion, Ochoa testified that he did not formally "hire" Lagunas and did not tell Lagunas that he was to start the next day; instead, Ochoa acknowledged that he only informed Lagunas that it was "likely" he would be offered the position, and that it looked "pretty good" for him. Similarly, although at various times in his deposition testimony Lagunas asserts that he was "hired" for the AUD position, he acknowledges that he was never given a formal offer of

3

employment for the position, and that pursuant to DADS' policies, he could not have been hired until after a background check had been conducted.

Nevertheless, it is uncontested that Ochoa did in fact select Lagunas as his top choice for the position and attempted to submit the paperwork to start the hiring process. In his affidavit, Ochoa averred that upon making his selection known to Braly, she informed him that she did not want to hire Lagunas for the position, and that she wished to conduct her own second round of interviews with Lagunas and Medina. Ochoa was consistent in both his affidavit and deposition testimony in expressing his opinion that Braly's actions interfered with his authority to hire Lagunas, and that her decision to reject Lagunas and to conduct her own second-round panel interviews, without including him and Hanway in the process, was a deviation from the "usual process" followed by DADS in making employment decisions.

### B. Braly Explains her Decision

After we issued our opinion in *Lagunas I,* Braly was deposed and also provided a second affidavit, in which she testified that when Ochoa informed her that he had selected Lagunas as the best qualified candidate, she reviewed Lagunas's application, and determined that he was not qualified for the position, as he did not have the required experience, education, skills, or knowledge to successfully perform as an AUD. After consulting with her supervisor, Braly assembled a panel of DADS' employees, including herself, to conduct a second round of interviews with Lagunas and Medina. Upon completion of the second round interviews, the panel decided that neither candidate was qualified for the position and declined to hire either of them. Braly swore that Lagunas's age did not play a factor in that decision.

4

Braly further testified that her involvement in the hiring process did not violate DADS' policies, averring that Ochoa and Hanway, although designated as the "hiring authority," were never given sole decision-making authority to fill the AUD position, and they were instead only tasked with making a recommendation that was subject to her final approval. Braly further testified that, as the Director of the Center, she always retained the final decision-making authority for all hiring decisions. DADS also submitted an affidavit from Amy Tippie, HHS's Deputy Director of Human Resources, who confirmed that the designated "hiring authority" did not have final decision-making authority in hiring a candidate, and that instead, several layers of approval were needed before an applicant could be formally hired into a position. Tippie further averred that "it is not uncommon" for a Center's Director, such as Braly, to occupy a decision-making role in the hiring process, particularly for supervisory and management positions.

## C. Braly's Restructuring Decision

After both Lagunas and Medina were rejected by the panel in the second-round interviews, Braly reposted the AUD position, but it does not appear that she conducted any interviews. Shortly thereafter, in April of 2013, Ochoa was removed as the acting Assistant Director of Programs. Around this same time, Hanway went on an extended medical leave after which she resigned her position. However, while Hanway was still serving as the Unit Director, Braly attempted to assist her by temporarily placing two other Center employees, Alice Villalobos and Joana Alferez, into two newly-created positions subordinate to Hanway, which were in effect AUD positions.[3] It is undisputed that both of these individuals were in their thirties.

---

[3] Although the temporary organizational chart does not refer to Alferez and Villalobos as being AUDs, as they were in subordinate positions to Hanway, we treat them as such for purposes of this appeal.

5

Braly testified that at this same approximate time, she made the decision, in coordination with her HHS supervisor, to restructure the Center to eliminate the two existing AUD positions and to replace those positions with Unit Directors. She testified that this was how the majority of other state supported living centers in Texas were organized. Braly also believed that the reorganization would further the Center's mission and attract better-qualified candidates for the management positions. She acknowledged that the Unit Director positions required significantly higher levels of education and more direct and relevant work experience than Lagunas possessed, making him unqualified for the positions. After the restructuring took place, Braly hired Alferez to fill one of the newly created permanent Unit Director positions, and another Center employee, Rosa Renteria, who was also in her thirties, to fill the other.

Lagunas did not apply for the permanent Unit Director position, as it required a bachelor's degree, which Lagunas admitted he did not possess. *Lagunas I*, 546 S.W.3d at 244.

## II. PROCEDURAL BACKGROUND

When he was not hired for the AUD position, Lagunas filed a lawsuit based on age discrimination, alleging, among other things, that DADS did not offer him the AUD position or subsequently eliminated the position during the restructuring, in order to avoid hiring him for the position. *Lagunas I*, 546 S.W.3d at 244-45. As we discuss below, in order to make out a prima facie case of age discrimination, Lagunas was required to come forward with evidence that (1) he was not hired for the position for which he applied, (2) he was qualified for that position, (3) he was a member of a protected class, and (4) someone younger than him was hired for the position. *Id.* at 251. In its first Plea to the Jurisdiction, DADS alleged that Lagunas had no evidence to support the fourth element of his claim, *i.e.*, that a younger person had been hired for the position.

6

*Id.* The trial court denied that claim, which we upheld in *Lagunas I*. We held that the record contained sufficient evidence to support that element, given Braly's placement of Alferez and Villalobos, who were both in their thirties, into the temporary AUD positions. *Id.* at 251. We therefore affirmed the trial court's denial of the plea on this issue and remanded the matter back to the trial court for further proceedings. *Id.* at 253.

Based on the additional information uncovered during discovery, DADS filed a second Plea to the Jurisdiction, alleging that (1) Lagunas could not meet the second element of his prima facie claim of discrimination, *i.e.,* that he was qualified for the AUD position; (2) Lagunas was disqualified because his resume misrepresented certain facts; and (3) Lagunas had failed to come forward with sufficient evidence to establish that DADS' articulated reasons for not promoting him, *i.e.,* Lagunas's lack of qualifications and Braly's decision to restructure the agency, were false or pretextual. The trial court denied the second Plea, and this interlocutory appeal followed.

### III. APPLICABLE LAW AND STANDARD OF REVIEW

#### A. Governmental Immunity and Pleas to the Jurisdiction

State agencies, such as DADS, are protected by sovereign immunity from lawsuits other than for claims for which their immunity has been waived by the legislature. *Lagunas I*, 546 S.W.3d at 246, *citing Tex. Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 388 (Tex. 2011); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). Absent such a waiver, a governmental unit's sovereign immunity implicates a trial court of subject matter jurisdiction. *Miranda*, 133 S.W.3d at 225-26. Pertinent to our analysis, the Texas Legislature has created a limited waiver of immunity for claims of age discrimination brought under the TCHRA. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012). That

7

waiver, however, extends only for those suits where the plaintiff actually alleges a violation of the TCHRA by pleading facts that state a claim thereunder. *Id.*

A governmental entity may challenge the validity of a plaintiff's claim through a plea to the jurisdiction. *Miranda*, 133 S.W.3d at 225-26; *Bland Independent School Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). A plea may attack the face of the pleading but may also include evidence which thereby places into issue the existence of a jurisdictional fact. *Miranda*, 133 S.W.3d at 226-27. When, as here, a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider all the relevant evidence submitted by the parties. *Id.* "If there is no question of fact as to the jurisdictional issue, the trial court must rule on the plea to the jurisdiction as a matter of law." *Lagunas I*, 546 S.W.3d at 246-47. On the other hand, if the jurisdictional evidence creates a fact question, then the trial court cannot grant the plea to the jurisdiction, and the issue must be resolved by the fact finder. *Id.* Our review of the trial court's decision mirrors that of our review of summary judgments, which we review de novo, accepting as true all evidence favorable to the non-movant, and indulging every reasonable inference and resolving any doubts in the non-movant's favor. *Id.*, *citing City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009); *Miranda*, 133 S.W.3d at 226–27; *State Dept. of Highways and Public Transp. v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002).

### B. The Shifting Burdens Under the *McDonnell Douglas* Framework

Texas courts recognize two alternative methods of proof in TCHRA discrimination claims. *See Williams-Pyro, Inc. v. Barbour*, 408 S.W.3d 467, 477-79 (Tex.App.--El Paso 2013, pet. denied), *citing Garcia*, 372 S.W.3d at 634. Under the first method, a plaintiff proves discriminatory intent with direct evidence. *Garcia*, 372 S.W.3d at 634. "Direct evidence is

8

evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Williams-Pyro, Inc.*, 408 S.W.3d at 478, *citing Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 897 (5th Cir. 2002).*[4] However, as courts have recognized, it is often difficult to prove "forbidden animus" through direct evidence. *Id.*, *citing Garcia*, 372 S.W.3d at 634 (recognizing that "motives are often more covert than overt, making direct evidence of forbidden animus hard to come by"). Therefore, Texas courts recognize a second method of establishing a claim under the TCHRA, which follows the burden-shifting mechanism described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See Garcia*, 372 S.W.3d at 634. Under this method, commonly referred to as the "*McDonnell Douglas*" framework, the plaintiff creates a presumption of discrimination through the "minimal" initial burden of establishing a prima facie case of discrimination. *Id.* In a failure-to-promote case such as this, in order to establish a prima facie case of discrimination, a plaintiff must come forward with evidence establishing the following four elements of his claim: (1) he was not hired for the position for which he applied; (2) he was qualified for that position; (3) he was a member of a protected class; and (4) someone younger than him was hired for the position. *Lagunas I,* 546 S.W.3d at 251.

If the plaintiff meets the initial burden of making out a prima facie case, discrimination is presumed, and the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Madden v. El Paso Indep. Sch. Dist.*, 473 S.W.3d 355, 360 (Tex.App.--El Paso 2015, no pet.), *citing Quantum Chem. Corp. v. Toennies*,

---

[4] In determining whether a plaintiff has set forth a valid claim for discrimination under the TCHRA, we rely on both State and Federal authorities, as Texas courts have recognized that one of the purposes of the TCHRA is to "provide for the execution of the policies of Title VII" of the Civil Rights Act of 1964, making it appropriate to look to federal law "to inform our construction and application of the TCHRA." *See Alamo Heights*, 544 S.W.3d at 764 n.5, *citing Garcia*, 372 S.W.3d at 633-34.

9

47 S.W.3d 473, 477 (Tex. 2001). Once an employer offers an ostensibly legitimate reason for their actions, the presumption disappears, and "[t]he burden then shifts back to the complainant to show that the employer's stated reason was a pretext for discrimination." *Id.*, *citing Quantum Chem. Corp.,* 47 S.W.3d at 477. To establish a fact question on the issue of pretext, the plaintiff must present evidence, which when viewed as a whole, would support a finding that the non-discriminatory reason given by the employer was false or not credible, and that the "real reason for the employment action was unlawful discrimination." *Id.* at 360-61, *citing Elgaghil v. Tarrant Cnty. Jr. Coll.,* 45 S.W.3d 133, 140 (Tex.App.--Fort Worth 2000, pet. denied). In meeting this burden, a plaintiff must do more than make a "bare assertion" or merely express his "subjective belief" that the defendant's reasons for its employment decision were both false and pretextual. *Id.* at 361; *see also Elgaghil*, 45 S.W.3d at 141.

Although the burden of production shifts between the parties in conducting a *McDonnell Douglas* analysis, the burden of persuasion remains continuously with the plaintiff. *See Quantum Chem. Corp.*, 47 S.W.3d at 477 (recognizing that in a pretext case, the burden of persuasion remains continuously on the plaintiff). In addition, as the Texas Supreme Court has recently made clear, all aspects of the *McDonnell Douglas* burden-shifting test, including the pretext prong, are considered jurisdictional, and may be addressed by a court in determining whether a governmental entity's immunity has been waived under the TCHRA. *See Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 783 (Tex. 2018) (recognizing that where "jurisdictional evidence rebuts the prima facie case, the entire *McDonnell Douglas* framework is fully implicated, and sufficient evidence of pretext and causation must exist to survive the jurisdictional plea").

## IV. NO DIRECT EVIDENCE OF DISCRIMINATION

Lagunas does not contend that he has any direct evidence that DADS had a discriminatory motive for failing to hire him for the AUD position. We agree with that concession. In *Lagunas I,* we noted that Ochoa swore in his affidavit that Braly did not want to hire Lagunas to fill the AUD position because of his age. 546 S.W.3d at 244. And we held in our opinion that this provided at least "some evidence" to support Lagunas's claim of discrimination. *Id.* at 252. However, in his deposition Ochoa acknowledged that he was merely speculating about Braly's motive and admitted that Braly never made any statements to him indicating that she was concerned about Lagunas's age. *See Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 164 (Tex. 2004) (speculative statements made in an affidavit may not be considered as "evidence" to defeat motion for summary judgment); *see also Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (recognizing that opinion testimony that is "conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact 'more probable or less probable,'" citing to Rule 401 of the Texas Rules of Evidence). Instead, Ochoa testified that Braly informed him that she did not want to hire Lagunas because she believed he was physically incapable of performing the AUD job functions, and because she generally disapproved of his appearance, in part because of his tattoos.

Second, Lagunas testified that while waiting for the second round of panel interviews, Medina encouraged him to drop out of the application process, saying that Braly did not want to hire him because she believed he was too old to serve as an AUD. Lagunas acknowledged, however, that he had no personal knowledge of whether Braly had actually voiced that opinion to Medina or anyone else, and he further acknowledged that no one else had conveyed any such

11

information to him. Lagunas recalled that prior to the second interview, he attempted to speak with Braly about his concerns with the hiring process, but was unable to do so, and chose not to bring up his concerns at this interview. The record does not contain an affidavit or any deposition testimony from Medina.

## V. THE MCDONNELL DOUGLAS BURDEN SHIFTING

DADS pitches its first two issues on appeal on the related claims that Lagunas was not qualified for the position, and that his application misstated his qualifications. The 2013 job posting for the AUD position listed the "Initial Screening Criteria" for the position as follows:

> Bachelor[']s degree in a related field and 2 years full time experience in broad based administration/supervision in the health care field in planning, organizing, directing, controlling, or coordinating activities. Work related experience may substitute for the required education on a year-for-year basis with a maximum substitution of four years. One year (18-25 semester hours) of graduate level work from an accredited college or university in a related field may substitute for the required work experience.

Lagunas acknowledges that he does not have a bachelor's degree, or the equivalent number of college hours required for such a degree   So, the parties join issue over whether Lagunas's work experience provided sufficient hours to round up his previous college course work to a degree, and whether his work experience qualified as "broad based administration/supervision in the health care field in planning, organizing, directing, controlling, or coordinating activities."

But even assuming for the sake of argument that Lagunas presented some evidence he was qualified, we still arrive at the question of whether he presented evidence that DADS' stated reason for not promoting Lagunas was a pretext for discrimination. Specifically, DADS argues in its third issue that Lagunas failed to meet his burden under the third part of the *McDonnell Douglas* framework, which requires that the employee raise a genuine issue of material fact as to whether

12

the employer's proffered reasons for denying him the promotion were pretextual. We agree. Because Lagunas fails to point to evidence establishing DADS' proffered reasons were false, the record lacks evidence from which an inference can be drawn that age was a motivating factor behind its decision not to promote Lagunas, making summary judgment appropriate.

Summary judgment will be improper if the plaintiff makes a prima facie case *and* produces sufficient evidence for a jury to disbelieve the employer's stated reason for failure to hire. *See Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 152 (2000) (in reversing grant of summary judgment the Court determined lower court had erroneously "disregarded critical evidence favorable to petitioner-namely, the evidence supporting petitioner's prima facie case and undermining respondent's nondiscriminatory explanation"). DADS' non-discriminatory reasons for ultimately not selecting Lagunas for the AUD position are (1) Braly concluded Lagunas "lacked the qualifications, experience, and knowledge to perform the job;" and (2) after determining Lagunas was not qualified, she decided to restructure the organization to more closely resemble those of other state supported living centers and eliminated the AUD job by subsuming the duties into two Unit Director positions to attract better-qualified applicants.

Regarding her belief that Lagunas lacked qualifications, Braly testified:

[Lagunas] was lacking experience in treatment and working with the population. Both of [his previous] positions were security positions where you were patrolling or looking for safety concerns, not providing resident care, working with residents, working with people in a health and human services setting. Instead, it was just observing if there were safety concerns, observing if emergency bags were properly done, not –not active treatment or physical nutritional management plans or anything like that. . . . [h]e also didn't have any formal training in, you know, psychology or anything related, really, to the treatment field that could compensate, you know, for any lack of experience. . . . I thought he was lacking both experience and educational background.

These reasons are non-discriminatory reasons for denying Lagunas the promotion. Consequently,

13

the presumption of discrimination created by Lagunas's prima facie case is eliminated. *Quantum Chem. Corp.*, 47 S.W.3d at 477. Without the benefit of the presumption, Lagunas is required to raise a genuine issue of material fact to meet his burden under the third part of the *McDonnell Douglas* framework to show that Braly's reasons for not promoting him--that she believed Lagunas lacked sufficient qualifications, skills and knowledge necessary for the job--were false. *Id.* "[W]hen the plaintiff offers proof that the employer's articulated reasons are false, the dispute must then be submitted to a jury to decide." *Russo v. Smith Intern., Inc.*, 93 S.W.3d 428, 438 (Tex.App.--Houston [14th Dist.] 2002, pet. denied).

However, in his briefing, Lagunas does not point to evidence demonstrating that Braly's reasons were false. In other words, Lagunas does not show he *did* have the experience that Braly claimed was missing. Nor does he claim that the experience that Braly found missing was unnecessary to the job. Instead, to support his contention that Braly's concerns about his job qualifications were false or pretextual, Lagunas makes the following assertions: (1) Braly was not the hiring authority for the AUD position, and she departed from "normal" hiring practices when she intervened in the selection process for that position; (2) Braly falsely claimed that she intervened in the selection process because she subjectively believed the AUD position was a "department head" position, when in fact the evidence demonstrated it was not; (3) Braly chose Joanna Alferez, who was in her thirties, over Lagunas, who was sixty, to temporarily serve in the AUD position; and (4) Braly later restructured the Center's management structure to eliminate the AUD position.

Even assuming these assertions are all true, they do not create a fact question as to whether Braly's concerns, that Lagunas lacked the education and direct health care experience for the job,

14

were false. Lagunas relies on the fact that the person who was temporarily appointed to the AUD position, Joana Alferez, was in her thirties. While that fact is necessary for purposes of establishing a prima facie case, it is insufficient, without more, to meet Lagunas's burden at the third step. *Little v. Republic Refining Co., Ltd.,* 924 F.2d 93, 98 (5th Cir. 1991). Moreover, Braly testified that Alferez was placed in the position instead of Lagunas because she was more qualified. Lagunas makes no effort to dispute Braly's testimony regarding Alferez's qualifications. Lagunas does not point us to any evidence establishing, for example, that Alferez was *unqualified* for the position, *as* qualified, or *less qualified* than he. And the record evidence confirms that Alferez was more qualified than Lagunas.

At the time of her selection, Alferez held a bachelor's degree in Biology, with a minor in Psychology, which met the education requirement that the applicant have a "Bachelor[']s degree in a related field . . . ." Alferez also had fulfilled 46 hours towards a master's degree in Public Administration, which was more than the 18-25 semester hours of graduate level work that Lagunas could claim. Alferez also met the subjective requirements that Braly believed were necessary for the job. At the time she was chosen for the AUD position, Alferez had been serving as the Director for Community Relations at the Center, which was a "department head" position with supervisory responsibilities over thirty volunteers, for over a year. As the Center's Community Relations Director, Alferez interacted with the residents on a daily basis, coordinated their activities, drove them to medical appointments, and assisted them with personal care, including dressing them and helping them use the toilet.

Moreover, to the extent that Lagunas can show he was minimally qualified for the job, or that Braly was unaware of additional skills and experience he had gained while being apprenticed

to Ochoa, a mistake when assessing an applicant's qualifications does not by itself create a fact issue regarding whether the proffered reasons are pretextual. *See Deines v. Texas Dept. of Protective and Regulatory Services*, 164 F.3d 277, 279 (5th Cir. 1999)("We reemphasize the general rule that differences in qualifications between job candidates are generally not probative evidence of discrimination unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue."). This is especially true under the facts here where Lagunas applied for a job that was not an obvious next step up from a security position.

Nor does the other evidence on which Lagunas relies create a fact question. At the time of the hiring decision, Braly was new to the Center and had been in the director position for less than three months. Consequently, it cannot be said that she had developed any "normal" hiring procedure at the El Paso Center that could cause a reasonable fact finder to characterize her intervention in this case as unusual. Moreover, given her recent arrival, it would not be unusual for a new director to want to reorganize her management team, to "better the facility and better operations." Finally, because she was new, it is also plausible that her understanding of the level of management duties of an assistant unit director differed from Ochoa's, and that consequently, her subjective belief that Lagunas's law enforcement experience was insufficient to meet the requirements of a job, which she believed to be more of a personal-care support position, was reasonable.

In sum, while the evidence to which Lagunas points supports the inference that Braly believed Lagunas was not a good fit for the position, it does not support the inference that she believed he was not a good fit for the position because of his age. To demonstrate that age was a

16

motivating factor behind Braly's hiring decision, Lagunas must do more than show he met the minimum requirements of the job, which he has not done. Rather the evidence here only establishes that Braly believed Lagunas lacked sufficient experience and knowledge related to active treatment and working directly with the DADS' population, and that Alferez possessed that experience and knowledge. Accordingly, it is undisputed that Alferez was more qualified for the position than Lagunas, which precludes a finding that Braly's proffered reasons were false.

## VI.  CONCLUSION

We therefore conclude that Lagunas has failed to establish that DADS' decision to restructure the department was made with discriminatory intent (Issue Three). We therefore sustain DADS' third issue. Consequently, we have no need to reach the question of whether the claimed false information in Lagunas's application would independently support dismissal of the claim under a "resume fraud" theory (Issue One), or whether Lagunas met the objective criteria set forth in the job posting for the AUD position (Issue Two). Having sustained DADS' third issue, we reverse the trial court's judgment and render judgment dismissing Appellee's claims for lack of jurisdiction.

JEFF ALLEY, Chief Justice

December 23, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.

17